**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Calvin Mayfield JONES, Lee Jackson
Keel, Defendants-Appellants.**

No. 81–7997.

United States Court of Appeals,
Eleventh Circuit.

Feb. 10, 1983.

As Amended on Denial of Rehearing
May 2, 1983.

---

David M. Olive, Birmingham, Ala. (Court Appointed), for Jones.

Arthur Parker, Birmingham, Ala., for Keel.

Holly Wiseman, Asst. U.S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before GODBOLD, Chief Judge, FAY and SMITH *, Circuit Judges.

PER CURIAM:

Keel and Jones were convicted by a jury of one count of bank robbery, 18 U.S.C. § 2113(a), (d) and 18 U.S.C. § 2.

Keel and Richard Wehby, who testified as a prosecution witness, decided to rob a bank and made several trips to locate a suitable target. By March 1981, six months before the actual robbery, Jones began to participate in the Keel/Wehby activities. He accompanied Keel and Wehby on one of their trips and went into a bank in a community approximately 30 miles from Tuscaloosa, Alabama, to "case" the bank. Eventually Keel and Wehby selected a bank in Tuscaloosa as the target. The two of them went to this bank some 30 or 40 times, systematically "cased" it, parked near the bank many times, observed the routine of its employees, and by using a scanner picked up signals of the Tuscaloosa police.

Around July 1981 Wehby grew impatient with Keel's procrastination about bringing off the robbery and withdrew from his intended role of actual participation. Jones became more active. During July or August, Jones discussed with Wehby robbing the Tuscaloosa bank and asked Wehby to steal a car to use in the robbery. Wehby stole two cars, but both were recovered before the robbery occurred. Keel discussed with Wehby that he and Jones were going to rob the bank. Keel bought wigs

* Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation.

and dark glasses. At trial Wehby was asked whether he had a conversation with Jones or Keel about disguising Jones during the robbery. Wehby responded that Keel told him Jones tried on the wig and it "did him no good." Wehby also testified that later it was determined that Jones would just wear a hat to conceal his identity during the robbery.

Wehby also testified that "they was planning to rob the bank and they needed a place to put [Jones]," and that he lent "them" $200, delivering the money to Keel, to put Jones up in a motel for around May, June and July of 1981, during which time "they" were supposed to "take care of business." Wehby identified "they" as Keel and Jones. When Jones was about to be evicted from the motel for nonpayment of rent, Wehby went to the motel and promised to pay the bill.

Keel discussed with Wehby how proceeds of the robbery would be split. Wehby was to get 50 percent (presumably this was before his withdrawal as an actual participant). No matter how large the take, Jones was to get 10 percent and no more because he "would drink it up and couldn't handle the money."

After Wehby receded from the activity, Jones began going to Tuscaloosa with Keel to observe the bank. Jones did not own an automobile. Two days before the robbery Jones, accompanied by Keel, purchased a green-colored car for cash. On September 24, the Tuscaloosa bank was robbed by two men. Keel was identified as one of them, but the other was not identified. A green car was used in the robbery. The day after the robbery Jones traded the green car he had purchased for another used car that he did not even take the time to test drive. He paid $500 in cash as partial payment, even though before the robbery he was destitute, received only a Social Security check, lived part of the time at the Salvation Army, and was described as being "without even cigarette money." The same day he paid a bill with $200 cash and bought dinner with a $100 bill.

The day after the robbery Wehby was in Tuscaloosa on business and heard of the robbery. Immediately he went to the FBI and told what he knew. He was paid an informer's fee of $1,500 and expected to get a reward of $5,000 offered by the bank and the insurance company. He was given immunity and testified for the government. He had no direct knowledge of whether Jones was the unidentified second robber.

### I. *Jones*

■ The court properly admitted evidence of Jones's possession of money after the robbery, the government having introduced evidence of his pre-robbery impecunious state. *Self v. U.S.*, 249 F.2d 32 (5th Cir.1957).

### II. *Keel*

■ The robbery occurred September 24. The government established that previously Keel had told Wehby he was going to Texas after the robbery, and that he had discussed with the manager of his apartment, approximately a month before the robbery, that he was leaving in about a month. Later, but still before the robbery, the manager told Keel that unless he paid his rent she would turn the matter over to an attorney. Keel told her that he was expecting a check at the end of the week and would pay his September rent from this. The day after the robbery Keel paid his September rent in cash.

On cross-examination the apartment manager was permitted to testify that Keel told her he was going to Texas because he was ill. The court refused to permit additional testimony by the manager that Keel said he was going to Texas because he was *dying of cancer* and wanted to spend his last days there. If this was error, it was error without injury.

■ The government offered the testimony of a department store salesman concerning substantial purchases of clothing by Keel a few days after the robbery. Keel objected on the ground that the salesman had been located through a sales slip found in Keel's apartment, which had been suppressed as evidence because it was beyond the scope of a search warrant that permitted search of the apartment. Government

counsel represented to the court that the salesman had not been located through the sales slip but through the name of the store appearing on a label in a blue blazer that belonged to Keel. The testimony concerning the clothing purchases was permitted. Then, during a recess, the government put on testimony to establish that the testimony of the salesman was not tainted by the suppressed sales slip. A government agent was examined. He testified that the sales slip was returned to the defendant soon after it was ordered suppressed and before the agent went to the store. He stated that he saw the blazer with the department store label in it, that he was instructed by government counsel to go to the named store, and that he should not use the sales slip to determine whether Keel had spent large sums of money at the store. He said that he followed those instructions and that, in any event, under routine procedure he would have checked with the store without having seen the sales slip. However, on cross-examination, the agent acknowledged that he recalled that the receipt showed large purchases (over $600), and when he called the store he inquired about the identity of the salesman who had made substantial sales to a person on the day in question, and this inquiry produced the correct person. Finally, in answer to a single question by the court the agent finally said that the receipt itself caused him to go to the store and investigate.

Under these circumstances the testimony of the salesman was inadmissible. The effect of the suppressed sales slip was not attenuated. However, we cannot find the government guilty of either intentional misconduct or gross negligence requiring reversal. As we have pointed out, the agent's testimony concerning what he relied on was conflicting. He was instructed not to use the slip. To the extent that it can fairly be concluded that he did use the slip, the use was not invidious, rather the agent used information he had learned from reading the slip and had not erased from his mind. The issue—substantial purchases of clothing as tending to show recently acquired funds—was peripheral. Wehby's testimony placed Keel as the principal actor in the robbery, and several witnesses positively identified him as such. Moreover, when Keel moved for a mistrial, after the agent's testimony, the court offered to strike all of the testimony of the clothing salesman, but Keel refused this and stood on his claim of right to a mistrial. In closing argument to the jury the government argued that the clothing purchases tended to show Keel's guilt on the theory of recently acquired funds. In his oral argument Keel sought to obtain affirmative advantage from the testimony of the clothing salesman. There had been some testimony that the chief actor in the robbery was wearing a blue blazer. Keel argued that the robber could not have been he because his blue blazer had been among the items bought at the clothing store after the robbery. Under all of these circumstances, we hold that admitting the evidence of the clothing salesman was error without injury beyond reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

There was no error in refusing to permit cross examination about allegedly conflicting statements Wehby had made to defense counsel and the prosecutor concerning an alleged suicide attempt by Wehby several years before the robbery.

AFFIRMED.