**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Marvin P. JOHNSON, Robert A. Wilkins, Duane Quamina, Patricia Gordon, Mark Francis Johnson, Defendants-Appellants.**

No. 82–8293.

United States Court of Appeals, Eleventh Circuit.

Aug. 29, 1983.

Stanley M. Baum (Court-appointed), Atlanta, Ga., for Marvin P. Johnson.

Hugh Peterson, Jr. (Court-appointed), Atlanta, Ga., for Wilkins.

J. Richard Young (Court-appointed), Atlanta, Ga., for Quamina.

P. Bruce Kirwan (Court-appointed), Atlanta, Ga., for Gordon.

William S. Sutton (Court-appointed), Atlanta, Ga., for Mark Francis Johnson.

Julie E. Carnes, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before HILL and HENDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

ALBERT J. HENDERSON, Circuit Judge:

Soon after midnight, on June 5, 1981, Delta Airlines employees in Atlanta discovered a young woman, Kathy Hargan, hiding in the cargo bin of a plane preparing for departure to New York. Through subsequent conversations with Hargan, law enforcement officials began to unravel an elaborate stowaway scheme. As the officers learned, the object of the plot was to steal assorted valuables being transported by the courier services of Wells Fargo, Brinks and Purolator aboard the flight. The investigation eventually resulted in the indictment of several persons involved in that scheme. In this appeal, we review the convictions of five of those participants: Marvin Johnson, Mark Johnson, Robert Wilkins, Duane Quamina, and Patricia Gordon. Finding no error of consequence, we affirm.

I.

In early January of 1981, Hargan met Marvin Johnson through an employee at the Wanna-Sauna Health Spa in Detroit, Michigan. Several months later, she traveled

with Johnson first to Rochester, New York then to New York City, and finally to Long Island to visit one of Johnson's relatives. During that time, the pair met with Robert Wilkins who, as Hargan had previously learned, was an employee of Wells Fargo. Wilkins explained to Johnson the logistical details concerning the company's transfer of its daily shipments of negotiable instruments, gold, cash and other valuables on various flights. He further informed them of the procedures employed to transport those shipments from the airport to the Wells Fargo office upon their arrival in New York. Based on that information, they concluded that the shipments were probably vulnerable to a theft only during the actual flight. After that meeting, Johnson began formulating a plan to secrete someone in the luggage compartment of the plane in an effort to steal the valuables. He and Hargan tentatively agreed that she would be an appropriate person to attempt the theft.

Several days later, Wilkins brought Johnson an assortment of clamps, locks, tags and lead seals, many of which were stamped with the Wells Fargo emblem. Wilkins explained to Hargan how those items were used to package the daily loads and further instructed her in skills associated with the identification of the company's bags. About this same time, Mark Johnson (Marvin's brother) joined the group at a motel in Hempstead, Long Island. Marvin obtained a large trunk and he and Mark went about the task of outfitting it for the project. To that end, they lined the trunk with foam rubber and installed an oxygen tank and an electric fan.

The group then made final preparations for the execution of the scheme. They chose the daily Atlanta to New York flight because Wilkins was most familiar with that route. The plan called for Hargan to hide in the trunk until it was safely placed in the plane's cargo bin.[1] After the departure, she was to exit from the trunk and open the various bags containing the Wells Fargo shipments and then reseal them in accordance with Wilkins's instructions. She was also to steal any other valuable freight that she might discover, such as Brinks or Purolator shipments. After having secured the items, she intended to place them in duffel bags carried along with the trunk. If she located any gold, she would replace it with bricks that were brought aboard in the same duffel bags.

On June 2, 1981, various persons connected with the enterprise arrived in Atlanta and assembled at a motel near the airport. That group included Mark Johnson, Hargan, Gordon, James Wright, Duane Quamina (whom Hargan had met earlier), and several other persons. At the motel, they readied the trunk, duffel bags and other items for the flight. Hargan was loaded in the trunk and the others donned matching shirts bearing the insignia, "Wayne County Gospel Choir." Several members of the group carried Bibles. When they reached the airport, they told Delta employees that the trunk contained their "stereo equipment." They succeeded with the charade to the point of getting Hargan safely stored away in the luggage compartment. But once the flight departed, she could not leave the trunk because it had been placed on a shelf thereby blocking her escape.

After they arrived in New York empty handed, Marvin Johnson bought a new trunk and made preparations for another attempt. Quamina, Mark Johnson and Hargan adapted that trunk in a manner similar to the original one. Then, on June 4, 1981, Hargan, Wright and Mark Johnson flew back to Atlanta.[2] They checked into a motel and quickly prepared everything for the flight that night. Upon returning to the airport, they learned that they had ar-

1. The group finally settled on Hargan as the most suitable person for this role. Before reaching that decision, however, Marvin Johnson, Wilkins, and Patricia Gordon (Wilkins's girlfriend) discussed whether Gordon might be a better candidate for the position.

2. To diminish the risk that Delta employees might recognize the group, the other persons did not make the second trip. For the same reason, Johnson and Wright abandoned the idea of posing as a gospel choir.

rived too late. While Wright and Johnson had sufficient time to board the flight as passengers, they were informed that their luggage, including the trunk, would have to be loaded on the next flight. They therefore abandoned the attempt that night. Back at the motel, they called Marvin Johnson who instructed them to remain in Atlanta overnight and try again the next day. Unfortunately, they lacked sufficient funds to stay another day. After another telephone exchange, Marvin sent them $100.00 by telegram for food and lodging.

The next night, they once again undertook their mission. When Delta baggage handlers loaded the trunk, Hargan's oxygen equipment came unattached. She consequently had difficulty breathing and began to panic. At that point, an airline employee thought he heard a sound originating from the trunk. He conferred with a co-worker and, after listening for a few more moments, decided that there was no reason to investigate further. Then, as one of the baggage handlers raised the loading platform to the cargo bin, he observed the trunk shaking noticeably. The employee alerted his supervisor and the plane was detained. Delta officials then lowered the door to the cargo bin and discovered Hargan sitting on top of the trunk.

The subsequent investigation eventually led to an indictment against both Johnsons, Wilkins, Quamina, Gordon, and Wright. After indictment, they were tried for conspiracy to commit offenses against the United States (18 U.S.C. § 371), wire fraud (18 U.S.C. § 1343), and aiding and abetting a stowaway (18 U.S.C. §§ 2 and 2199).[3] At the ensuing trial, the government's case consisted primarily of the extensive testimony of both Hargan and Wright,[4] as well as motel records, airline records, physical exhibits, and fingerprints that corroborated

many of the details of their story. The jury found each defendant guilty on all three counts. On appeal, the defendants assign numerous errors in the district court trial.[5]

## II.

█ The defendants first contend that the district court erred in refusing to grant their various motions for a severance. Each of the defendants, either expressly or by adoption of their co-defendants' motions, maintain that they were unduly prejudiced by a "spill-over" effect from the evidence. In addition, Mark Johnson, Wilkins, and Quamina insist that the joint trial impermissibly deprived them of significant exculpatory evidence. Both of these arguments are premised on Fed.R.Crim.P. 14, which permits a severance if it appears that the defendants or the government will be prejudiced by the joinder. That decision is entrusted to the discretion of the trial judge and will not be disturbed on appeal absent an abuse of that discretion. *E.g., United States v. Bovain,* 708 F.2d 606, 608 (11th Cir.1983). Mindful of the latitude afforded the district court in such situations, we turn to an examination of the defendants' particular claims.

## A.

█ In evaluating whether the evidence against one defendant had a harmful spill-over effect on the jury's deliberations of the other defendant's guilt, the court must consider

[w]hether under all circumstances of the particular case ... it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury

---

**3.** That stowaway count pertained to the June 2, 1981 trip. A fourth count of the indictment charged them with the same offense on June 5, 1981. The district court, however, directed a verdict for the defendants on that count.

**4.** By prior arrangement, the government did not seek an indictment against Hargan. Instead, she pled guilty to an information alleging

the stowaway charge. Similarly, after he was indicted, Wright reached a plea agreement with the government.

**5.** Each appellant has adopted, to the extent possible, the arguments advanced by the others. *See* Fed.R.App.P. 28(i).

**640**

keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted.

*Peterson v. United States,* 344 F.2d 419, 422 (5th Cir.1965); *see also United States v. Lippner,* 676 F.2d 456, 464–65 (11th Cir. 1982). In this inquiry, a defendant must demonstrate "compelling prejudice" caused by the alleged evidentiary spill-over, which effectively precluded the jury's ability to make the necessary individualized determination. *See, e.g., United States v. Varella,* 692 F.2d 1352, 1360 (11th Cir.1982); *United States v. Phillips,* 664 F.2d 971, 1016–17 (5th Cir.1981) (Unit B), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).[6] Absent such a showing, the policy favoring a single trial of persons jointly indicted should prevail. *See Bovain,* 708 F.2d at 608; *Varella,* 692 F.2d at 1360.

■ Here, the defendants have fallen far short of establishing any compelling prejudice. They base their suggestion of spill-over solely on the fact that the evidence did not substantiate the participation of each defendant in every phase of the conspiracy. However, "[d]emonstrating that the evidence is stronger against a co-defendant than oneself does not satisfy the burden of showing *compelling* prejudice." *United States v. Marable,* 574 F.2d 224, 231 (5th Cir.1978) (emphasis in original); *United States v. Partin,* 552 F.2d 621, 641 (5th Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977); *see also United States v. Berkowitz,* 662 F.2d 1127, 1135 n. 8 (5th Cir.1981) (Unit B). At the trial, the testimony of Hargan and Wright evidenced the extensive participation of each defendant in the scheme. Given that proof, the mere fact that every person was not present at each stage of the conspiracy did not create a disparity in the evidence great enough to confuse the jury. *See, e.g., Berkowitz,* 662 F.2d at 1135 n. 8; *United States v. Morrow,*

537 F.2d 120, 137 (5th Cir.1976), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). Furthermore, the trial judge's cautionary instructions admonishing the jury to consider each defendant's guilt separately obviated the likelihood of a spill-over effect. *See Lippner,* 676 F.2d at 456; *United States v. Marszalkowski,* 669 F.2d 655, 661 (11th Cir.), *cert. denied,* ── U.S. ──, 103 S.Ct. 208, 74 L.Ed.2d 167 (1982); *Phillips,* 664 F.2d at 1017. Under the circumstances, the appellants have not shown the "specific and compelling prejudice" necessary to justify a finding that the district court abused its discretion. *See, e.g., United States v. Butera,* 677 F.2d 1376, 1385 (11th Cir.1982), *cert. denied,* ── U.S. ──, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983).

**B.**

Mark Johnson, Wilkins and Quamida also insist that they were entitled to a severance to enable their co-defendant, Marvin Johnson, to testify on their behalf. During the course of the trial, each of these defendants presented the district court with an affidavit, prepared either by Johnson or his attorney, outlining the exculpatory evidence he would relate in a separate trial. But once the court denied any severances, Johnson refused to testify, claiming his fifth amendment privilege. On appeal, the defendants contend that their inability to obtain that testimony deprived them of a fair trial.

■ To authorize a severance on these grounds, a defendant must initially prove "a bona fide need for the testimony, the substance of the desired testimony, the exculpatory effect of the desired testimony, and that the co-defendant would indeed have testified at a separate trial." *Marable,* 574 F.2d at 231; *see also Bovain,* 708 F.2d at 610; *United States v. Rice,* 550 F.2d 1364, 1369 (5th Cir.1977), *cert. denied,* 434 U.S. 954, 98 S.Ct. 478, 54 L.Ed.2d 312 (1977); *Byrd v. Wainwright,* 428 F.2d 1017,

**6.** All decisions of the former Fifth Circuit Court of Appeals rendered prior to October 1, 1981 are binding on this court. *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (*en banc*). In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), this court also adopted as precedent all decisions of Unit B of the former Fifth Circuit, regardless of the date of issuance.

1019–22 (5th Cir.1970). Once that threshold showing has been made, the court must then (1) assess the significance of the alleged exculpatory evidence, (2) gauge the potential prejudice that might result from the absence of that testimony, (3) heed the concern for judicial economy, and (4) give weight to the timeliness of the motion. *Bovain,* 708 F.2d at 610; *Morrow,* 537 F.2d at 135.

■ According to these considerations, the defendants' motions were deficient in several respects. On the first day of trial, Quamina submitted an affidavit by Marvin Johnson, indicating that he would testify in a separate trial that "Quamina had no knowledge of any scheme or plan to steal Brinks and Wells Fargo shipments as alleged in the indictment, and therefore did not knowingly participate in any such scheme." That statement was little more than a "bare conclusory assertion" tracking the language of the indictment. *Cf. United States v. DeSimone,* 660 F.2d 532, 539–40 (5th Cir.1981) (Unit B) *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982). Lacking specificity, the affidavit demonstrated little, if any, exonerative significance. Similarly, the proffered testimony would not have countered the evidence of Quamina's considerable involvement in the scheme on several crucial occasions when Johnson was not present. *See United States v. Butler,* 611 F.2d 1066, 1071 (5th Cir.), *cert. denied,* 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980); *United States v. Edwards,* 549 F.2d 362, 366 (5th Cir.), *cert. denied,* 434 U.S. 828, 98 S.Ct. 107, 54 L.Ed.2d 87 (1977). Finally, the alleged exculpatory testimony "lacked a certain amount of credibility," in that it did not contravene Johnson's own penal interests. *See DeSimone,* 660 F.2d at 540; *United States v. Metz,* 608 F.2d 147, 156 (5th Cir. 1979), *cert. denied,* 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980); *United States v. Alfonso,* 552 F.2d 605, 616 (5th Cir.), *cert. denied,* 434 U.S. 857, 98 S.Ct. 179, 54 L.Ed.2d 129 (1977); *United States v. Alejandro,* 527 F.2d 423, 428 (5th Cir.), *cert. denied,* 426 U.S. 923, 96 S.Ct. 2632, 49 L.Ed.2d 377 (1976).

While the proffer of Wilkins was slightly more detailed, it still suffered from many of the same defects. Again, Johnson's affidavit essentially tracked the language of the indictment, denying that Wilkins furnished any Wells Fargo materials to either Johnson or Hargan (cited as an overt act in Count I), that Wilkins furnished any information about the company's shipments, and that Wilkins generally had any involvement in either the attempted theft or the wire fraud. These conclusory allegations provided little "clear indication of specific and exonerative facts to which he would testify" that might contradict Hargan's extensive testimony concerning Wilkins's role in the scheme. *DeSimone,* 660 F.2d at 540, *see also United States v. Burke,* 495 F.2d 1226, 1234 (5th Cir.), *cert. denied,* 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974). More important, by failing to inculpate the affiant in any way, the proffer lacked any substantial credibility. *See, e.g., Metz,* 608 F.2d at 156.

Unlike Wilkins and Quamina, Mark Johnson submitted the sworn statement of Marvin Johnson's attorney, outlining in some detail the testimony Marvin would purportedly give in a severed trial. Essentially, the proffer alleged that Marvin sent his brother to Atlanta to assist in the stowaway plan, but that he never discussed with him the objective of the scheme. Standing alone, this specificity is not a sufficient reason to grant a severance. The affidavit does not contradict the ample testimony of both Hargan and Wright concerning Mark's activities with other members of the conspiracy. *See Butler,* 611 F.2d at 1071; *Edwards,* 549 F.2d at 366. Those activities, to which Marvin was not privy, afforded numerous indications of Mark's complete awareness of the purpose of the stowaway efforts.[7] Additionally, the affidavit care-

---

7. For example, Wright testified that Mark Johnson explained to him the reason for the stowaway attempt.

fully avoided any implication that Marvin himself knew the objective of the conspiracy, thereby insuring that he could likewise disclaim familiarity with its goal. Thus, in view of the minimal extent to which the affidavit contravened his penal interest, it lacked persuasive credibility. *See, e.g., DeSimone,* 660 F.2d at 540.

In summary, none of the defendants made a showing that Johnson's testimony would be sufficiently exculpatory to outweigh the concerns for judicial economy favoring a joint trial. *Accord Bovain,* 708 F.2d at 612–13; *DeSimone,* 660 F.2d at 540; *Butler,* 611 F.2d at 1071. Accordingly, the district court did not abuse its discretion in denying the severance motions.

### III.

The defendants launch a broadside attack on the government's theory of the case and on the sufficiency of the evidence adduced to support the convictions under that theory. To that end, they assert that the prosecutor's interpretation of Count II of the indictment constituted a constructive amendment and that they were convicted under an impermissibly broad theory of conspiracy liability. Because these various contentions are inextricably interwoven with their sufficiency allegations, we address them together.

■ Before proceeding to a discussion of the particular issues raised, we take note of the well-established principles governing our review of the sufficiency of the evidence. We must examine the evidence in the light most favorable to the government, accepting all reasonable inferences that support the verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942). From that perspective, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided

a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.) (Unit B *en banc* ), *aff'd on other grounds,* —— U.S. ——, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1982). With that standard of review in mind, we turn to an examination of each of the three counts, beginning with the substantive charges.

### A.

■ The defendants do not present even a tenable challenge to the sufficiency of the evidence supporting their guilt on Count III. That count accuses them of aiding and abetting a stowaway on an aircraft, in violation of 18 U.S.C. §§ 2 and 2199. Hargan and Wright testified in great detail that Quamina, Gordon, and Mark Johnson joined in both the preparation for the subterfuge and its actual accomplishment. Similarly, Hargan stated that Marvin Johnson purchased the necessary equipment and that he directed the alteration of the trunk to make it habitable for Hargan. Finally, the evidence showed that Wilkins gave Hargan extensive instructions concerning the commission of the theft once she was safely concealed in the plane's cargo bin. Based on that proof, the jury had an ample basis to conclude that each defendant aided and abetted the stowaway scheme.[8] *See, e.g., United States v. Cole,* 704 F.2d 554, 559 (11th Cir.1983); *United States v. Smith,* 700 F.2d 627, 633 (11th Cir.1983); *see generally Bell,* 678 F.2d at 549.

### B.

By contrast, the defendants' convictions on Count II are more troublesome. In that count, they were charged with use of a wire communication for the purpose of executing a scheme and artifice to defraud, in violation of 18 U.S.C. §§ 2 and 1343. Midway through the trial, the district court—in a

---

**8.** In a related argument, the defendants maintain that the government failed to prove that Delta did not consent to Hargan's stowaway. This contention borders on the frivolous. At the trial, one of the company's pilots testified that the airline's policy prohibited any person from riding in the cargo bins. In addition, Hargan admitted that she did not obtain Delta's permission to ride in the baggage section.

colloquy with counsel outside the presence of the jury—suggested uncertainty as to whether the government had established a scheme to defraud, as contemplated by the statute. Responding to the judge's concerns, the district attorney first construed the charge as a plan to defraud Wells Fargo and Brinks. Later, however, he adjusted his argument and defined the relevant scheme as one to defraud Delta. The district court eventually instructed the jury in accordance with the latter characterization. In this court, the appellants allege that this depiction of the pertinent scheme amounted to a constructive amendment of the indictment.

■ "An *amendment* of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them."[9] *United States v. Salinas,* 654 F.2d 319, 324 (5th Cir.1981), *quoting, Gaither v. United States,* 413 F.2d 1061, 1071 (D.C.Cir.1969) (emphasis in original). An error of this magnitude is *per se* reversible because it violates the defendant's constitutional right to be tried solely on the charges returned by the grand jury. *United States v. Figueroa,* 666 F.2d 1375, 1379 (11th Cir.1982); *United States v. Gonzalez,* 661 F.2d 488, 492 (5th Cir.1981) (Unit B); *see generally Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). The constitutional requirement implicated not only preserves the defendant's right to be accused by his fellow citizens, but also insures that the defendant will have adequate notice of the charges against him and that he will be protected against double jeopardy. *E.g., United States v. Carroll,* 582 F.2d 942, 945 (5th Cir.1978). Consequently, we must determine whether the trial judge's instruction to the jury "so modifie[d] the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment." *United States v. Ylda,* 653 F.2d 912, 914 (5th Cir.1981); *see also United States v. Davis,* 679 F.2d 845, 851 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1198, 75 L.Ed.2d 441 (1983).

■ While the prosecutor's wavering interpretations of the count lend some support to the appellants' position, the indictment itself[10]—the surest indication of the

---

**9.** A constructive amendment must be distinguished from a *variance,* which is present "when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *Salinas,* 654 F.2d at 324, *quoting, Gaither,* 413 F.2d at 1071.

**10.** Count Two read:

From a date unknown to the Grand Jury and continuing until June 6, 1981, within the Northern District of Georgia, the defendants MARVIN PERCIVAL JOHNSON, a/k/a Marvin D. Johnson, a/k/a Jay Johnson, a/k/a Raymond Joseph Malone, MARK FRANCIS JOHNSON, a/k/a Chris Taylor, a/k/a Charles Rambo, a/k/a Charles Justin, JAMES THOMAS WRIGHT, a/k/a Howard Atkins, ROBERT A. WILKINS, DUANE QUAMINA, PATRICIA GORDON, JOHN DOE a/k/a Hershey, whose true name is unknown to the grand jury, and Kathy Hargan who is not named as a defendant herein, aided and abetted by each other, devised a scheme and artifice to defraud other persons and corporations of money and property and to obtain money and property by means of false and fraudulent pretenses and representations well knowing that said pretenses and representations were and would be false when made.

2. It was a part of said scheme and artifice to defraud that defendants would arrange to have Kathy Hargan concealed in a trunk in a cargo bin of Delta Airlines flight 1178 traveling from Atlanta, Georgia to New York, New York, in order to enable Hargan to take money and other things of value being shipped by Wells Fargo Armored Service Corporation, Brinks Incorporated, and others.

3. It was further a part of said scheme and artifice to defraud that the defendants would and did make and cause to be made certain representations, well knowing at the time that said representations were false when made, including but not limited to the following:

(a) that defendants MARK FRANCIS JOHNSON, JAMES THOMAS WRIGHT, DUANE QUAMINA, PATRICIA GORDON, and JOHN DOE, a/k/a Hershey, were members of a gospel choir, and

(b) that said defendants were shipping musical equipment in the trunk that concealed Kathy Hargan.

4. On or about June 5, 1981, the defendants, in the Northern District of Georgia, aided and abetted by each other, did transmit and cause

grand jury's intent—refutes their claim of a constructive amendment. The initial paragraph of the count defines the pertinent scheme only in general terms as a "scheme and artifice to defraud other persons and corporations of money and property by means of false and fraudulent pretenses and representations." But the next paragraph qualified that broad definition, stating that "[i]t was a part of said scheme" to conceal Hargan in the cargo bin of a Delta flight to facilitate the intended theft. Even more revealing however is the indictment's further specification of the false representations allegedly made by the defendants to implement the scheme to defraud. In that paragraph, the grand jury listed the defendants' charade as a gospel group aboard the plane and their claim that they were shipping musical equipment in the trunk that harbored Hargan. Both of those misrepresentations, of course, were

made to Delta employees. Thus, as the indictment clearly illustrates, the grand jury was focusing on the stowaway aspect of the defendants' overall plan as a basis for the wire fraud charge.[11]

For that reason, the district court's instruction that Count II concerned a scheme to defraud Delta did not "modif[y] the elements of the offense charged." See Ylda, 653 F.2d at 914. Despite the government's vacillating characterization, the evidence established, the jury was instructed, and the defendants were convicted on the precise charge for which the grand jury indicted them. We therefore reject their claim of a constructive amendment.[12]

▇ In their challenge to the convictions on Count II, the defendants also assert that the use of the wire communication was too incidental to their scheme to fall within the ambit of § 1343. The statutory provision, however, prohibits any use "for the

to be transmitted by means of a wire communication in interstate commerce, certain signs and signals, to wit: a Western Union telegram for $100.00 from defendant MARVIN PERCIVAL JOHNSON in the State of New York to Kathy Hargan in Atlanta, Georgia, for the purpose of executing the aforesaid scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343 and Section 2.

11. The defendants do not suggest that the stowaway attempt does not constitute a scheme to defraud. Cf. United States v. Blassingame, 427 F.2d 329, 330–31 (2d Cir.1970) (affirming wire fraud conviction of a defendant who obtained a free charter flight by fraudulently inducing airline to extend him credit), cert. denied, 402 U.S. 945, 91 S.Ct. 1629, 29 L.Ed.2d 114 (1971). Instead, they limit their argument to whether the grand jury intended to indict them for that scheme.

12. Our holding is also supported by the rule that

when the indictment charges a violation of a statute in general terms, proof of acts of the kind described, although those acts are not specifically mentioned in the indictment, does not constructively amend it, at least absent a determination that this was, or might have been, prejudicial to the defendant.

United States v. Malatesta, 583 F.2d 748, 756 (5th Cir.1978), modified on other grounds, 590 F.2d 1379 (5th Cir.) (en banc), cert. denied, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979); see also United States v. Hyde, 448 F.2d 815,

838 (5th Cir.1971), cert. denied, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972). That situation differs from the context in which this court has actually found a constructive amendment. Customarily, a constructive amendment occurs because the trial court instructs the jury on an expressly different crime than the one alleged in the indictment. See, e.g., Figueroa, 666 F.2d at 1378–79 (defendant charged with attempted air piracy by means of force and violence; convicted of attempt by alternative means of threats and intimidation); United States v. Bizzard, 615 F.2d 1080, 1081 (5th Cir.1980) (defendant charged with robbery by means of placing a life in jeopardy; convicted of robbery by alternative means of assault); see also Carroll, 582 F.2d at 943–44 (defendant charged with conspiracy to violate federal securities and postal laws; jury instructed on conspiracy to violate securities laws, postal laws, and statute prohibiting interstate transportation of fraudulently obtained money).

Here, the instruction to the jury was entirely consistent with the indictment, since the count did not specify a scheme to defraud Wells Fargo and Brinks. Viewing the charge in a light most favorable to the defendants' position, Count II at most defined the "scheme" in "general terms." Given that fact, under Malatesta, proof of a scheme to defraud Delta did not constructively amend the original charge. Moreover, the defendants can show no prejudice arising from the more specific delineation of the scheme at the trial, since the other more express terms of the indictment referred only to the subterfuge of Delta.

purpose of executing such scheme." As held by the former Fifth Circuit Court of Appeals, "§ 1343 only requires that the defendant transmit or cause to transmit an interstate or foreign communication. *intending* that the communication will help further the scheme." *United States v. Hammond,* 598 F.2d 1008, 1010 (5th Cir.) (emphasis in original), *modified on other grounds,* 605 F.2d 862 (5th Cir.1979); *United States v. Patterson,* 528 F.2d 1037, 1041 (5th Cir.), *cert. denied,* 429 U.S. 942, 97 S.Ct. 361, 50 L.Ed.2d 313 (1976); *see also United States v. Davanzo,* 699 F.2d 1097, 1101 (11th Cir.1983). In this instance, Marvin Johnson sent Mark, Hargan and Wright $100.00 by telegram to enable them to eat and sleep in Atlanta. The overnight stay was necessary to the implementation of their plan, once they missed their flight on the night of June 4, 1980. Under these circumstances, the telegraphic transfer of money was certainly intended to further the scheme.[13] *Cf. United States v. Becker,* 569 F.2d 951, 964 (5th Cir.), *cert. denied,* 439 U.S. 1048, 99 S.Ct. 726, 58 L.Ed.2d 708 (1978) (use of wire to transfer co-conspirator his share of the fraudulent profit deemed sufficient).

■ Finally, the defendants challenge the sufficiency of the evidence to support the jury's guilty verdict on Count II. Hargan's testimony about the circumstances of the wire transmission, coupled with the introduction of the telegram itself, amply supported the convictions of Marvin (the sender) and Mark (the receiver). On the other hand, the evidence furnished no indication that Wilkins, Quamina and Gordon participated in any manner in the monetary transfer. Nevertheless, as the government points out, if the evidence established that those defendants joined in the conspiracy, then their "culpability extends to all substantive offenses committed in furtherance of that conspiracy." *United States v. Berkowitz,* 662 F.2d 1127, 1140 (5th Cir.1981)

(Unit B); *see Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed.2d 1489 (1946). Thus, their convictions for wire fraud are contingent upon their guilt of the conspiracy charge.

### C.

Count I charged the defendants with a conspiracy, in violation of 18 U.S.C. §§ 2 and 371, to unlawfully convert an interstate shipment (18 U.S.C. § 659) and to commit wire fraud (18 U.S.C. § 1343). Again, the appellants attack the sufficiency of the evidence introduced by the government to prove the charge.

■ The record is replete with evidence establishing the knowledge and participation of each defendant in a conspiracy to steal the interstate shipment. Without repeating the evidence summarized earlier, it is only necessary to note that both Hargan and Wright testified at great length about the active part played by each person involved in the scheme and about several conversations indicating their knowledge of the purpose of the venture. Other evidence—including the items used in the stowaway, various telephone and motel records, and fingerprints—substantially corroborated their account. Confronted with that proof, the jury was entitled to conclude that "the evidence establishes guilt beyond a reasonable doubt." *Bell,* 678 F.2d at 549.

■ Nevertheless, Wilkins urges that even if the evidence supported a conspiracy to commit the theft, it was inadequate to sustain a finding that the defendants conspired to engage in wire fraud. Therefore, in his view, the convictions on Count I are invalid. We cannot agree. As the former Fifth Circuit Court of Appeals observed in affirming an identical conspiracy conviction,

[d]etermining whether [a defendant] agreed to a particular objective is . . .

---

13. We agree with the defendants that "[i]t is a fact of life that everyone must sleep somewhere and occasionally eat." Appellant Mark Johnson's Brief at 29. Nonetheless, the routine use of the money does not alter the fact that the $100.00 was sent to assist the plan. The

transfer of funds in this case permitted the defendants to stay *in Atlanta,* so that they could carry out their theft plan on the following day. By facilitating their stay in Georgia, the money assisted them in executing the scheme.

unnecessary in a case involving a conspiracy with multiple and related criminal objectives. The basic theory of conspiracy is vicarious liability, and once a defendant becomes associated with a conspiracy, he is responsible for all acts of it. *United States v. Bolts*, 558 F.2d 316, 325 (5th Cir.1977) (citations omitted), *cert. denied*, 439 U.S. 898, 99 S.Ct. 262, 58 L.Ed.2d 246 (1978);[14] *accord, United States v. Griffin*, 699 F.2d 1102, 1104 and 1107 (11th Cir.1983). Thus, based on the theory of conspiracy, "[i]t has always been the law that where an indictment alleges a conspiracy to commit several offenses against the United States, the charge is sustained by adequate pleadings and proof of conspiracy to commit any one of the offenses." *United States v. James*, 528 F.2d 999, 1014 (5th Cir.), *cert. denied*, 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976); *see also United States v. Wedelstedt*, 589 F.2d 339, 340 (8th Cir.1978), *cert. denied*, 442 U.S. 916, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); *United States v. Dixon*, 536 F.2d 1388, 1401–02 (2d Cir. 1976). *But see, e.g., United States v. Tarnopol*, 561 F.2d 466, 475 (3d Cir.1977). Because the evidence here overwhelmingly established the defendants' participation in the major objective of the conspiracy (the intended theft of the interstate shipment), we sustain the convictions on Count I.[15]

## IV.

In the district court, Wilkins filed a motion to dismiss the indictment challenging, on both statutory and constitutional grounds, the composition of the grand and petit juries. The motion also alleged race and sex discrimination in the selection of grand jury forepersons. Wilkins, as well as the other defendants, renew this complaint on appeal. However, after a careful review of the record, we conclude that these claims are not properly before us.[16]

The fundamental defect in the defendant's attempt to assert this issue is the complete absence of any evidence in the record supporting their claim. Throughout the proceedings in the district court, they never made any effort to offer such proof. Rather, they sought only to rely on the

---

**14.** In *Bolts,* the defendant was convicted on a count charging a conspiracy to commit four separate narcotics offenses, including the use of a communications facility to further a drug felony (21 U.S.C. § 843(b)). 558 F.2d at 316. In a post-trial ruling, the district court concluded that no evidence linked Bolts to the use of the communications facility, and therefore, that he should receive the longer sentence applicable to a conviction for conspiracy to possess narcotics with intent to distribute. *Id.* at 325. On appeal, the defendant challenged that construction of the verdict. Specifically, he asserted a due process right to be advised of the particular substantive offense forming the basis of the jury's guilty verdict on the conspiracy count. *Id.*

The former Fifth Circuit rejected his argument. According to the court, a finding that the defendant participated in the overall conspiracy rendered it unnecessary to determine "whether he agreed to a particular objective." *Id.* at 325–26. In addition, the court concluded that a verdict in this posture does not pose a risk of a non-unanimous verdict. *Id.* at 326 n. 4; *accord, United States v. Wilkinson,* 601 F.2d 791, 796 & n. 5 (5th Cir.1979); *United States v. Murray,* 618 F.2d 892, 898 (2d Cir.1980).

While the verdict in *Bolts* is identical to Wilkins' characterization of the conspiracy verdict in this case, the issues addressed by the *Bolts* panel differ slightly from those posed here. Still, the same reasoning that dictated the result in *Bolts* is dispositive of Wilkins' contention. *See, e.g., Griffin,* 699 F.2d at 1104.

**15.** In support of their argument, the defendants rely on several cases, including one binding on this court. *See Van Liew v. United States,* 321 F.2d 664 (5th Cir.1963). *Van Liew,* however, involved the demonstrably different situation where one of the conspiratorial objectives listed in the indictment actually failed to state a criminal offense. 321 F.2d at 672; *see Griffin,* 699 F.2d at 1104 n. 9 (drawing same distinction with *United States v. Irwin,* 654 F.2d 671 (10th Cir.1981), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982), which followed *Van Liew.*) *Compare United States v. Carman,* 577 F.2d 556, 567 (9th Cir.1978) (following *Van Liew,* but requiring reversal only in cases where the charged substantive offense fails to state a crime).

**16.** The government and the defendants dispute whether any of the other defendants joined in Wilkins's motion in the district court. While we tend to agree with the government, our conclusion that even Wilkins failed to preserve this contention properly obviates the need to resolve that issue.

evidence presented in another unrelated action pending in the United States District Court for the Northern District of Georgia.[17] In fact, while the motion to dismiss attempted to incorporate the facts of the other case "insofar as they relate[d]" to the defendants' case, the defendants never even submitted proof, by affidavit or otherwise, establishing that the grand jury involved in the other action was the same as the one which returned the indictment in their case.

More important, the defendants never made the records in the other action a part of the record in the present case. In his Report and Recommendation, the Magistrate summarily rejected the contentions made in the motion to dismiss, citing other decisions in the Northern District of Georgia upholding the selection of jurors and forepersons. Thereafter, in his general objections to the Magistrate's report, Wilkins requested permission to incorporate the records of three other cases into his own record.[18] However, he never brought this demand to the attention of the district court or asked the trial judge for a ruling on his application. As a consequence, the district court did not issue an order incorporating the other records. Likewise, the government never entered a stipulation agreeing that the defendants could adopt the records developed in the other proceedings.[19] Thus, by neither including the records of the other cases nor presenting any evidence on

their own initiative, the defendants have "failed to present this court with any facts which could support a finding that the grand [and petit] jury selection and impanelment process was improper." *United States v. Atchley,* 699 F.2d 1055, 1058 (11th Cir.1983).

 Recognizing this deficiency in the record, Wilkins proposes two alternative means of curing the defect. First, he urges this court to construe the lack of a ruling by the district court as acquiescence to his request to adopt the other records. Such an approach, however, overlooks the problems created by the fact that the district court never considered or ruled on Wilkins's application. Of greatest significance, the parties disagree on what issues would be presented for our review even if the defendants were able to incorporate the other records at this point. On the one hand, the defendants appear to assert both statutory and constitutional infirmities in the method of selecting grand and petit jurors, as well as grand jury forepersons. In contrast, the government vigorously insists that, because of the evidently limited nature of the case on which the defendants rely, at most the foreperson selection question is before this court. Similarly, in its present state, the record indicates that the defendants may have waived any statutory challenge to the jury selection procedures by failing to comply with the strict requirements of 28

---

**17.** In the motion to dismiss the indictment, the basis for the request was identified as follows:

6.

Defendant Robert A. Wilkins hereby specifically adopts a Motion to Dismiss Indictment, to Stay Proceedings, and For Discovery filed in *United States v. Lucian Lamar Sneed,* CR No. 81–56A, and hereby re-alleges all grounds in said Motion and all authority in support of said Motion, including the Preliminary Memorandum submitted in connection therewith.

7.

Defendant Robert A. Wilkins has no new evidence to offer in this Motion and hereby adopts all facts asserted in *United States v. Lucian Lamar Sneed* insofar as they relate to either of the two grand juries which returned indictments against defendant as stated above.

Record on Appeal, Vol. IV at 413. As the motion reveals, the defendant depended on the other case not only for a factual record, but also for his legal arguments.

**18.** Yet Wilkins did not ask to adopt the record developed in the *Sneed* case, upon which his original motion was based and which he relies on in this court.

**19.** In a supplemental brief, the government indicates a willingness to permit Wilkins, but only Wilkins, to adopt the record filed in another appeal pending before this court. *United States v. Sneed,* No. 82–8565 (11th Cir. filed August 30, 1982). Nonetheless, we cannot construe this statement as a stipulation, since the government and the defendant have a substantial disagreement over the scope of the issues presented by such an adoption.

U.S.C. § 1867.[20] In short, absent an express ruling by the district court, we are unable to ascertain the precise issues presented for our consideration.[21]

■ Alternatively, Wilkins suggests that we remand the case to the district court to afford the trial judge an opportunity to perfect the record. While Fed.R. App.P. 10(e) authorizes such a procedure to correct or modify the record, it does not contemplate the action advocated in this case. As the court observed in *United States v. Page,* 661 F.2d 1080, 1082 (5th Cir.1981), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 136 (1982),

> [w]hat in fact went on below may be settled and placed of record pursuant to Rule 10(e) and whatever proceedings are necessary to that end are permissible. New proceedings of a substantive nature, designed to supply what might have been done but was not, are beyond the reach of the rule.

(Emphasis in original); *see also United States v. Smith,* 493 F.2d 906 (5th Cir.1974); *c.f. United States v. Lockwood,* 604 F.2d 7, 8 (5th Cir.1979) (denying government's request for limited remand for hearing to determine whether a waiver of the right to a jury trial in fact occurred).

■ Finally, even if there were a satisfactory means available at this stage to rectify the inadequacy of the record, we would not be inclined to excuse the defendants' failure to perfect the record in the trial court. To support their motion to dismiss the indictment, it was incumbent upon the defendants to establish facts to sustain a finding of the alleged statutory and constitutional violations. *See, e.g., Bryant v. Wainwright,* 686 F.2d 1373, 1375–76 (11th Cir.1982) (outlining burden that must be met to show discrimination in the selection of grand jury forepersons); *United States v. Carter,* 568 F.2d 453, 455 (5th Cir.1978) (recognizing showing necessary to prove a violation of the Jury Selection and Service Act); *see also United States v. Perez-Hernandez,* 672 F.2d 1380, 1386–87 (11th Cir.1982). The mere reference in a written motion to similar issues pending in an unrelated case was regrettably inadequate.[22] If a defendant seeks to satisfy this burden by relying completely on the proceedings in another action, he must, at a minimum, either obtain an order from the district court authorizing the incorporation of the record developed in the other case or enter a stipulation with the government for that purpose. Because the defendants did not even take this meager step to perfect the record, we are unable to divine the issues presented for our review, much less assess the merits of the claims. Accordingly, we conclude that the defendants have waived any challenge to the jury selection.

### V.

Mark Johnson alleges that the district court impermissibly denied him the right to

---

**20.** That provision requires that a defendant seeking a dismissal on the basis of a statutory violation file the motion "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier." 28 U.S.C. § 1867(a). That timeliness requirement was intended to be strictly enforced. *See, e.g., United States v. Bearden,* 659 F.2d 590, 600 (5th Cir.1981) (Unit B), *cert. denied,* 456 U.S. 936, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982). "Where a defendant relies on a jury challenge motion filed by another defendant, the seven-day period provided in the Act for filing a motion begins to run from the date the defendant has knowledge or could have obtained knowledge of the earlier motion." 659 F.2d at 599. Here, Wilkins filed the motion a month after the indictment was returned and more than two months after the filing of the motion which he sought to adopt.

**21.** For the same reasons, staying the disposition of this case pending the resolution of the *Sneed* appeal (or consolidating the two cases) would be to no avail. The record before us does not even establish that the same grand jury is involved, much less clarify the extent to which a decision in *Sneed* would apply in this case. We therefore deny Wilkins's pending motion for consideration.

**22.** The defendants have cited no authority condoning this cursory method of supporting a motion filed in the district court. Nor can we discern any reason for approving such a procedure. To the contrary, the orderly administration of justice would be ill-served if that practice were permissible.

suppress two duffel bags and their contents. The problem arose when the testimony at the trial revealed that the items were seized by a Delta employee, evidently acting at the direction of an FBI agent, from the baggage claim area at the airport. Upon discovering this testimony, Johnson's counsel moved for a mistrial or, failing that, for a suppression hearing outside of the presence of the jury. As a basis for the request, he cited the government's failure to list those items in response to a pre-trial inquiry seeking the disclosure of any evidence obtained by a search or seizure. The prosecutor countered by claiming that Johnson had no expectation of privacy in the items, because they had been abandoned at the airport. Confronted with this situation, the district court summarily denied defense counsel's various requests. Although the trial judge did not state the grounds for the denial, the record suggests that he either accepted the government's position or determined that the motion to suppress was untimely.[23]

■ Under the circumstances, we do not view the request as untimely. While Fed. R.Crim.P. 12 deems a suppression motion not made "prior to trial" to be waived, it authorizes relief from the waiver "for good cause shown." In this instance, the government's failure to furnish notice of its intent to introduce the duffel bags into evidence violated its pre-trial discovery duties under Rules 12(d)(2) and 16(a)(1)(C).[24] Such an omission certainly excuses the defendant's belated attempt to exclude the items. Likewise, on the record before us, we are unable to assess the substantive legality of the search and seizure by which the authorities secured the articles. Due to the paucity of the evidence surrounding the seizure and the absence of any factual findings as required by Rule 12(e),[25] we cannot make a principled determination whether the challenged police conduct contravened the fourth amendment.

■ In spite of these deficiencies, we do not discern any error of such magnitude as to necessitate a reversal of Johnson's conviction. Even assuming that the duffel bags and their contents were acquired in an unconstitutional manner, the error, if any, in admitting that evidence was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The government's chief witness, Hargan, furnished the critical evidence against the defendant. She described every aspect of the theft scheme, including the various articles carried aboard the plane to implement that plan. She also explained that the duffel bags contained bricks to be exchanged for any gold bullion obtained from the shipments. Therefore, the introduction of the items themselves was essentially cumulative. Their evidentiary value was limited to the corroboration of Har-

---

**23.** The summary denial of the motions soon after the prosecution set forth its theory of abandonment, which was the only ground of admissibility urged by the government, implies that the court may have adopted that reasoning. On the other hand, when another defendant's attorney later mentioned that the belated discovery excused the untimeliness of the suppression request, the trial judge replied, "I don't know that it does and I don't necessarily agree with that, but I understand that's your position." Trial Transcript, Vol. IV at 160.

**24.** We note that the government's failure to make the disclosure required by Rule 12(d) does not mandate automatic exclusion of the evidence. *See* Fed.R.Crim.P. 12 advisory committee note. This is especially true "where the failure to give notice was not deliberate." *Id.* In this case, there is no indication that the government is guilty of intentional misconduct.

To the contrary, the prosecutor's timely notice of other items obtained by a search suggests that the omission was inadvertent.

**25.** Before this court, the government advances two substantive theories to justify the seizure. In addition to renewing the abandonment argument relied upon in the district court, it contends that the search and seizure does not implicate the fourth amendment because it was accomplished by a private individual, the Delta employee, for purely private reasons. *See, e.g., United States v. Lamar,* 545 F.2d 488, 489–90 (5th Cir.), *cert. denied,* 430 U.S. 959, 97 S.Ct. 1609, 51 L.Ed.2d 810 (1977). The dearth of factual development in the district court precludes an evaluation of either of these contentions, since both require a fact-specific inquiry. *See, e.g., Lamar,* 545 F.2d at 490 (private conduct); *United States v. Colbert,* 474 F.2d 174, 176 (5th Cir.1973) (*en banc*) (abandonment).

gan's testimony. To the same effect, the government produced more than twenty other articles found in the plane's cargo bin. Those exhibits included the trunk, the oxygen and ventilation equipment, the various tools for facilitating entry into the shipments, and the assorted Wells Fargo locks, seals and tags intended to disguise the break in. In light of this convincing proof verifying Hargan's account of the scheme, even the corroborative value of the duffel bags was minimal. Thus, given the overwhelming evidence of the defendant's guilt, we conclude that the error, if any, in admitting the items was harmless beyond a reasonable doubt. *See United States v. Jones,* 697 F.2d 989, 992 (11th Cir.1983); *United States v. Phillips,* 664 F.2d 971, 1024 (5th Cir.1981) (Unit B), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *cf. United States v. Gresham,* 585 F.2d 103, 109 (5th Cir.1978) (district court's failure to conduct adequate inquiry on admissibility of one confession was harmless, in view of second confession that was properly admitted).

### VI.

During the trial, the manager of the New York City office of Wells Fargo testified with respect to Wilkins's duties as a messenger guard for the company. He explained that the defendant supervised an armored vehicle and that, as a part of his daily route, Wilkins stopped by the airport to pick up the shipments arriving from Atlanta. Later, during his initial summation, the government's attorney urged that Wilkins's responsibility for that pick-up might have prompted the choice of the flight originating in Atlanta as the target of the theft.[26] Wilkins's attorney responded to that suggestion by emphasizing the lack of any evidence that his client had been on hand to meet these particular flights.[27] In rebuttal, the prosecutor then stated,

> [w]ell, Mr. Peterson [Wilkins's attorney] says, well, don't you think that if Mr. Abbott had the facts to show he was at that flight he would have proved it? Well, that's a clever tactic. And I will be the first to tell you that the law is that the burden here rests upon the Government that these Defendants don't have to lift a finger, and the Government has to prove them guilty beyond a reasonable doubt. But don't let Mr. Peterson fool you. If he had those records he could have shown them to you just as we could have done.
>
> Now, it may be you didn't see them because a prosecutor wasn't smart enough to show them to you.

Trial Transcript, Vol. VI at 135. Wilkins insists that those remarks impermissibly

---

**26.** The prosecutor stated,
> [w]hy they chose Atlanta? They, of course, chose Atlanta because that's what Mr. Wilkins knows about best because he knows those routes and also I submit it is obvious to you by now because in fact Mr. Wilkins may be able to be there when that shipment comes in. That is why they can be guaranteed to have at least 20 minutes after they get on the plane before Wells Fargo discovers anything is amiss.
>
> You recall Mr. Hall told you that the Wells Fargo people are supposed to check it at the time it arrives in New York. But in fact, I submit to you that Bobby Wilkins is on that shipment he can guarantee that it is not checked until it gets back to the office.
Trial Transcript, Vol. VI at 110.

**27.** Defense counsel argued,
> [b]ut Mr. Abbott [the prosecutor] will come back and say, "Ah-huh, Mr. Wilkins was going to be there to pick it up."

> Mr. Abbott didn't prove that. He had two Wells Fargo men here, one of them who was responsible for setting the time Mr. Wilkins worked.
>
> He had brought in record after record, FBI agent after FBI agent. Don't you think that if he could have proved that Robert Wilkins was going to be there to pick up that shipment on the 3rd of June he would have proved it?
>
> Don't you think that if he was going to prove that Robert Wilkins was going to be there to pick up that shipment on the 5th of June, the time it was supposed to come on the second flight, according to Mr. Abbott's version of the case, he would have proved it?
>
> He didn't present a bit of evidence on that point.
Supplemental Record at 10.

commented on his decision not to testify and that they improperly referred to alleged evidence not before the jury. Similarly, the other defendants allege that the reference to evidence not introduced at the trial prejudicially created the impression that the government possessed additional, undisclosed proof against all of them.

 It is well-established that [t]o reverse for improper comment by the prosecutor, we must find one of two things: that 'the prosecutor's manifest intention was to comment upon the accused's failure to testify' or that the remark was 'of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'

United States v. Rochan, 563 F.2d 1246, 1249 (5th Cir.1977), quoting, Samuels v. United States, 398 F.2d 964, 968 (5th Cir. 1968), cert. denied, 393 U.S. 1021, 89 S.Ct. 630, 21 L.Ed.2d 566 (1969); see also United States v. Bright, 630 F.2d 804, 825 (5th Cir.1980). The record in this case furnishes no indication whatsoever that the prosecutor meant his argument to have such effect. Nor can the remarks reasonably be construed as referring to Wilkins's failure to take the stand. As this court has recognized, "[a] comment on the failure of the defense, as opposed to that of the defendant, to counter or explain the testimony presented or evidence introduced is not an infringement of the defendant's fifth amendment privilege." Duncan v. Stynchcombe, 704 F.2d 1213, 1215–16 (11th Cir. 1983) (emphasis in original); see also United States v. Fogg, 652 F.2d 551, 557 (5th Cir.1981), cert. denied, 456 U.S. 905, 102 S.Ct. 1751, 72 L.Ed.2d 162 (1982); Bright, 630 F.2d at 825. Here, the prosecutor merely emphasized the defense's failure to produce any documentary evidence rebutting the reasonable inference that, because

he customarily picked up the Atlanta shipment, Wilkins may have met the flights which were the object of the theft. Such an argument was permissible. See Duncan, 704 F.2d at 1215–16; Fogg, 652 F.2d at 557–58; see also United States v. Jones, 648 F.2d 215, 218 (5th Cir.1981). In addition, given the prosecutor's accompanying acknowledgement that the government bore the burden of proof, as well as the district court's later instruction to the same effect, the remark did not shift the burden of proof. See Duncan, 704 F.2d at 1216; United States v. Downs, 615 F.2d 677, 679 (5th Cir.), cert. denied, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980).

 On the other hand, the implication that the government possessed evidence that had not been introduced was improper. A prosecutor "may not suggest that evidence which was not presented at trial provides additional grounds for finding defendant guilty." United States v. Garza, 608 F.2d 659, 663 (5th Cir.1979); see also United States v. Dorr, 636 F.2d 117, 120 (5th Cir. 1981); United States v. Phillips, 664 F.2d 971, 1030 (5th Cir.1981) (Unit B), cert. denied, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). However, the impropriety of the remark does not compel a reversal unless the comment "prejudicially affected substantial rights of the defendants." Dorr, 636 F.2d at 120; see also Phillips, 664 F.2d at 1030. In this instance, there was no such prejudice. Taken in the context of the entire closing argument, the challenged statement was both brief and oblique. The potential impact of the remark was further diminished by the district court's instruction that counsel's arguments did not constitute evidence before the jury. See Phillips, 664 F.2d at 1031. In view of the strength of the evidence against each defendant,[28] the error was harmless. See id.

---

28. Contrary to Wilkins's assertion, the government's case against him did not hinge on whether the jury believed that he picked up the shipment on those particular occasions. Rather, the prosecution's theory, which was amply supported by the evidence, portrayed the defendant as playing a much broader role in the

scheme. The testimony suggested that Wilkins provided the others with the details of Wells Fargo's established shipping procedures and that he furnished several company items to facilitate the operation. Thus, the insinuation that the government had records proving Wilkins's presence at those flights at most bol-

## VII.

Patricia Gordon was the sole defendant to take the witness stand during the trial. She disavowed any knowledge of the stowaway scheme. Thereafter, prior to closing arguments, Gordon's attorney informed the court that he intended to contrast to the jury his client's willingness to testify with the silence of the co-defendants. The court permitted comment that Gordon testified, but prohibited any reference to the fact that the others did not take the witness stand. Gordon now insists that this restriction prejudicially hindered the presentation of her defense and therefore deprived her of a fair trial.

■■■ Gordon incorrectly assumes that she has an unconditional right to comment on her co-defendants' silence, even though such a remark would impair their fifth amendment rights. *See, e.g., United States v. Berkowitz,* 662 F.2d 1127, 1136 (5th Cir. 1981) (Unit B). To the contrary, the asserted right exists only when defense counsel has a "clear duty" to make the argument in order to avoid prejudicing the client. *See, e.g., United States v. Kopituk,* 690 F.2d 1289, 1319 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983). That duty does not arise unless the defenses set forth by the co-defendants are truly antagonistic. *Gurleski v. United States,* 405 F.2d 253, 265 (5th Cir.1968), *cert. denied,* 395 U.S. 981, 89 S.Ct. 2140, 23 L.Ed.2d 769 (1969); *see also United States v. Badolato,* 701 F.2d 915, 924 (11th Cir. 1983). Even in that situation, the proper remedy is a severance, rather than prejudicing the rights of other defendants. *DeLuna v. United States,* 308 F.2d 140, 141 (5th Cir.1962).

■■■ Gordon never requested a severance on those grounds or suggested that mutually exclusive defenses necessitated reference to the other defendants' failure to testify. Instead, her attorney characterized

the argument merely as an effort to "make a favorable comment as to [his] client's testimony." Trial Transcript, Vol. VI at 128. Nor does Gordon raise the spectre of antagonistic defenses on appeal. As she acknowledges, the requested statement "would have been made solely in developing [her] defense so as to curry sympathy from the jury, [to] bolster her testimony and to enhance her credibility." Appellant's Brief at 9. Under these circumstances, the district court struck the proper balance by limiting the argument. *See Gurleski,* 405 F.2d at 265; *see also Kopituk,* 690 F.2d at 1319; *United States v. Wilson,* 451 F.2d 209, 215 (5th Cir.1971), *cert. denied,* 405 U.S. 1032, 92 S.Ct. 1298, 31 L.Ed.2d 490 (1972); *United States v. Lemonakis,* 485 F.2d 941, 952–53 (D.C.Cir.1973), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974).

## VIII.

Wilkins complains that the district court erred by refusing to entertain his requests to charge. Specifically, he assigns error to the court's refusal to give his proposed instruction on circumstantial evidence and an instruction prohibiting any adverse inference from the failure to cross-examine a witness.

■■■ Relying upon N.D.Ga. Local R. 201.1, the trial court denied the requests as being untimely because they were not submitted at or before the opening of the trial.[29] The defendant contends that the local rule conflicts with Fed.R.Crim.P. 30, which requires the filing of written requests "[a]t the close of the evidence or at such earlier time during the trial as the court reasonably directs." Unlike Wilkins, we view the two provisions as entirely compatible. In the form of a local rule, the district court has merely required, as Rule 30 permits, filing at an earlier point in the proceedings. To say that "the opening of trial" is not a time "during the trial" is an exercise in

---

stered a peripheral aspect of the case. *Cf. Dorr,* 636 F.2d at 120 (improper argument may have affected jury's perception of credibility question, which lay at the "very crux" of their decision).

**29.** We note that the district court also treated the government's untimely requests in the same manner.

semantics. In short, the district court did not err by enforcing the deadline mandated by Local R. 201.1. *Cf. United States v. Lustig,* 555 F.2d 737, 751 (9th Cir.1977) (requests filed at close of evidence, contrary to local rule requiring submission five days prior to trial, were untimely), *cert. denied,* 434 U.S. 1045, 98 S.Ct. 889, 54 L.Ed.2d 795 (1978).[30]

▪ Even if the requests had been timely submitted, there was no error in refusing them. The proposed instruction on circumstantial evidence was a restatement of the proposition that the proof must be "inconsistent with every reasonable hypothesis of innocence." *See, e.g., United States v. White,* 611 F.2d 531, 539 (5th Cir.), *cert. denied,* 446 U.S. 992, 100 S.Ct. 2978, 64 L.Ed.2d 849 (1980). As the former Fifth Circuit has noted on numerous occasions, "when the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect." *United States v. Stokes,* 471 F.2d 1318, 1321 (5th Cir.1973), *citing, Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); *see also United States v. Clements,* 588 F.2d 1030, 1040 (5th Cir.), *cert. denied,* 441 U.S. 936, 99 S.Ct. 2062, 60 L.Ed.2d 666 (1979); *United States v. Washington,* 550 F.2d 320, 327 (5th Cir.), *cert. denied,* 434 U.S. 841, 98 S.Ct. 138, 54 L.Ed.2d 105 (1977). More important, the "reasonable hypothesis" formulation no longer even controls *judicial* scrutiny of the evidence in this circuit. *See United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (Unit B *en banc*), *aff'd on other grounds,* ── U.S. ──, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).[31] Similarly, the requested charge pertaining to the failure to cross-examine witnesses was suf-

ficiently covered by the general instructions emphasizing that counsel's conduct did not constitute evidence and that the defendant was not required to produce any evidence. *See, e.g., United States v. L'Hoste,* 609 F.2d 796, 805 (5th Cir.) ("A trial judge is under no obligation to give a requested instruction that ... has been covered adequately by other instructions."), *cert. denied,* 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980).

## IX.

▪ More than seven months after he filed his original brief in this appeal and less than three weeks before the scheduled date for oral argument, Marvin Johnson, in a supplemental brief, alleged for the first time that his transfer from the custody of the state of Michigan to the Northern District of Georgia violated the Interstate Agreement on Detainers (IAD), 18 U.S.C. App., as construed in *Cuyler v. Adams,* 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981), and *United States v. Mauro,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978). Although this claim appears to lack substance, *see Cody v. Morris,* 623 F.2d 101, 103 (9th Cir.1980); *United States v. Caramian,* 468 F.2d 1370, 1371 (5th Cir.1972), we need not reach that question. Because Johnson failed to call this purported irregularity to the attention of the district court, he has waived any right to challenge the transfer proceedings on appeal. *See Mars v. United States,* 615 F.2d 704, 707 (6th Cir.), *cert. denied,* 449 U.S. 849, 101 S.Ct. 138, 66 L.Ed.2d 60 (1980); *United States v. Eaddy,* 595 F.2d 341, 346 (6th Cir.1979); *cf. United States v. Boggs,* 612 F.2d 991, 993 (5th Cir.) (failure to raise alleged violation of IAD until § 2255 motion to vacate sentence con-

---

**30.** Wilkins cites *Bruno v. United States,* 259 F.2d 8 (9th Cir.1958), in support of his argument that Rule 30 nullifies the local provision. In *Bruno,* the court did indeed conclude that the federal rule superseded a local requirement that requests be filed at "the opening of the trial." 259 F.2d at 9. Nevertheless, *Lustig* casts considerable doubt on the continuing validity of *Bruno* in the Ninth Circuit. To the extent, if any, that the older case still reflects the view of that court, we decline to follow it.

**31.** In *Bell,* the court stated that "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." 678 F.2d at 549. *Bell* is binding precedent. *See Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir. 1982).

stitutes waiver), *cert. denied,* 449 U.S. 857, 101 S.Ct. 156, 66 L.Ed.2d 72 (1980).

## X.

In summary, we conclude that none of the defendants' various assignments of error constitute grounds for reversal. As we have observed on numerous occasions, an accused is entitled to a fundamentally fair trial, but he cannot be guaranteed a perfect one. *E.g., United States v. Blasco,* 702 F.2d 1315, 1329 (11th Cir.1983); *see also Corn v. Zant,* 708 F.2d 549, 560 (11th Cir. 1983). At most, the admissibility of the duffel bags and the prosecutor's brief comment during closing argument are the only procedural infirmities in the trial of this case. However, despite the defendants' protestations to the contrary, the record contains overwhelming evidence showing the active involvement of each defendant in the elaborate, but doomed, scheme. In view of the strength of the evidence, those insignificant errors could not have affected the substantial rights of the defendants.

The convictions are AFFIRMED.