796 F.2d 1394
 UNITED STATES of America, Plaintiff-Appellee,
v.
Steven Robert BOLINGER, Robert Jerome McTeer, Bruce Hayes
Munro, Juan Carlos de la Fuente, Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
Johnny Dean HALL, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Juan Carlos DE LA FUENTE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Oscar CRUZ-BARRIENTOS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Juan Carlos DE LA FUENTE, Defendant-Appellant.
 Nos. 84-3528, 84-3638, 84-3751, 84-3758 and 84-3860.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 15, 1986.
 
 John C. Wilkins, III, Bartow, Fla., for Bolinger.
 Elizabeth L. White, Jacksonville, Fla., for McTeer.
 Dan R. Warren, Daytona Beach, Fla., for Munro.
 Bruce Hinshelwood, Asst. U.S. Atty., Orlando, Fla. for Appellee.
 Bernard Dempsey, Manuel Socias, Orlando, Fla., Mark J. Kadish, Atlanta, Ga., Alan J. Baverman, Kadish & Kadish, P.C., Atlanta, Ga., for de la Fuente.
 Marc Lubet, Lubet & Woodard, Orlando, Fla., for Hall.
 Linda Carroll, Miami, Fla., for Cruz-Barrientos.
 Bruce Hinshelwood, Asst. U.S. Atty., Orlando, Fla., for U.S.
 Appeals from the United States District Court for the Middle District of Florida.
 Before RONEY and CLARK, Circuit Judges, and FAIRCHILD,* Senior Circuit Judge.
 CLARK, Circuit Judge:
 
 
 1
 Juan Carlos de la Fuente, Steven Robert Bolinger, Oscar Cruz-Barrientos, Johnnie Dean Hall, Robert McTeer and Bruce Munro appeal from their convictions for engaging in a continuing criminal enterprise in violation of 21 U.S.C. Sec. 848 (de la Fuente), conspiracy to possess cocaine and in excess of 1,000 pounds of marijuana with intent to distribute in violation of 21 U.S.C. Sec. 846 (Bolinger, McTeer, Munro), conspiracy to import cocaine in violation of 21 U.S.C. Sec. 963 (de la Fuente, Cruz-Barrientos), importation of cocaine in violation of 21 U.S.C. Sec. 952 (de la Fuente, Hall), and possession of cocaine with intent to distribute in violation of 21 U.S.C. Sec. 841 (de la Fuente, Bolinger). We affirm.
 
 I. FACTS
 
 2
 According to government witnesses, de la Fuente was the head of a scheme to distribute marijuana and to import and distribute cocaine. Charles Burroughs, who testified extensively for the government, described himself as de la Fuente's "bookkeeper, collector, organizer, and whipping boy." Record, Vol. 46 at 229.
 
 
 3
 Beginning in December, 1980, de la Fuente and Burroughs met to plan the distribution of large quantities of marijuana. The first sales took place in North and South Carolina. As of the summer of 1981, the operation had moved to central Florida. Testimony linked government witness Charles Hitchens and defendants McTeer and Bolinger with the Florida marijuana operations.
 
 
 4
 Because of collection difficulties and the theft of a large quantity of marijuana, de la Fuente and Burroughs decided to obtain cocaine in Bolivia and bring it to Florida for distribution. Planning began in the fall of 1981. An airplane was purchased and outfitted for the importation. The plan called for Cruz-Barrientos to help fly a plane carrying forty-two kilograms of cocaine from Bolivia to Honduras. There, the cocaine was to be transferred to a seaplane (the "Goose") and flown to Florida by pilot Rick McPherron and Hall, who was to kick the drugs out of the plane at a predetermined spot. On February 16, 1982, according to plan, Burroughs, Hitchens and Karl Koermandy waited for the Goose at a crossroads approximately fifty miles from Gainesville, Florida. As the bundles of cocaine dropped from the side of the plane, Burroughs could see McPherron at the controls.
 
 
 5
 Customs officers intercepted the seaplane off the west coast of Florida and followed it for about an hour and a half. They lost sight of it for twenty to thirty minutes and re-established contact as the seaplane was landing at the Gainesville airport. They did not see anything unloaded from the plane as they followed it. At the airport, the customs officers watched as McPherron and Hall got off the otherwise empty aircraft.
 
 
 6
 Burroughs and Hitchens took the cocaine to Hitchens' house in central Florida. The cocaine was processed and sold over the next eight months. Cocaine was delivered to Bolinger and Munro among others. Munro also helped plan an aborted scheme to sell most of the cocaine to someone in California.
 
 
 7
 Following a lengthy investigation by Drug Enforcement Administration agents, participants in the marijuana and cocaine operations provided information forming the basis of a six-count indictment naming appellants and several others as defendants.[1] Count one charged de la Fuente with engaging in a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. Sec. 848. Count two charged de la Fuente, Bolinger, McTeer, Munro and others with conspiracy to possess cocaine and in excess of 1,000 pounds of marijuana with intent to distribute in violation of 21 U.S.C. Sec. 846. Count three charged de la Fuente and another co-defendant with possession of in excess of 1,000 pounds of marijuana with intent to distribute in violation of 21 U.S.C. Sec. 841. Count four charged de la Fuente, Cruz-Barrientos, Hall and others with conspiracy to import cocaine in violation of 21 U.S.C. Sec. 963. Count five charged de la Fuente, Hall and others with importation of cocaine in violation of 21 U.S.C. Sec. 952. Count six charged de la Fuente, Bolinger and others with possession of cocaine with intent to distribute in violation of 21 U.S.C. Sec. 841. Count one (CCE) identified counts two through six as predicate offenses.
 
 
 8
 Following a three-week trial, the jury found de la Fuente guilty of counts one, four, five and six and failed to reach a verdict with respect to counts two and three. It found Bolinger guilty of counts two and six. The jury returned a verdict of guilty against McTeer and Munro on count two. It acquitted Hall on count four (conspiracy to import), but failed to reach a verdict as to count five (substantive importation). Finally, the jury failed to reach a unanimous decision with respect to Cruz-Barrientos on count four. On retrial, Hall was found guilty of importation of cocaine and Cruz-Barrientos was found guilty of conspiracy to import cocaine.
 
 
 9
 After the jury returned its verdicts following the initial trial, de la Fuente moved for a new trial or for acquittal on the ground that a juror, H.L. ("Junior") Hunter, expressed his belief in de la Fuente's guilt during conversations with his neighbor and obtained extrinsic information about de la Fuente's arrest prior to the conclusion of trial. The court permitted de la Fuente's counsel to interview the jurors. On July 18, 1984, the court held an evidentiary hearing at which those jurors subpoenaed by de la Fuente's counsel testified.
 
 
 10
 As a result of the hearing, the court found that juror Hunter had read enough of a newspaper article to learn that one to two hundred thousand dollars had been seized in a raid on de la Fuente's home or place of business. Although finding that Hunter referred to the article in the presence of several jurors, it found that only juror Hodges overheard the substance of Hunter's comments. Because the evidence of de la Fuente's guilt was "overwhelming," the court concluded that Hunter's misconduct was harmless and denied the motion for new trial.
 
 
 11
 In September, 1984, de la Fuente again moved for a new trial on the basis of an affidavit sworn by juror Quick. Because Quick was in Europe when the hearing on juror misconduct took place, de la Fuente's counsel had been unable to interview him or call him to testify at the July 18, 1984 hearing. The district court denied the second motion because Quick's affidavit was untimely and insufficient to overcome the evidence in favor of the verdicts against de la Fuente.
 
 II. ISSUES
 
 12
 On appeal, de la Fuente argues that the finding of juror misconduct should have raised a presumption of prejudice necessitating a new trial. Bolinger and McTeer also argue that they were prejudiced by the juror misconduct and should be granted new trials. De la Fuente further argues that he should be given a new trial on the CCE count on the basis of government witness Burroughs' post-trial "recantation" of his testimony against de la Fuente, that trial of the CCE count should have been severed to permit co-defendants to testify on his behalf, that conspiracy cannot be a predicate offense to a CCE charge and that the jury should have been instructed that "in concert" in the CCE statute requires the government to prove agreement. Cruz-Barrientos contends that the evidence at retrial was insufficient to support his conviction for conspiring to import cocaine. Hall argues that principles of collateral estoppel and double jeopardy should have barred the government from retrying him for substantive importation of cocaine or from introducing on retrial evidence used against him at the first trial once he had been acquitted of the conspiracy to import charge. Hall also appears to argue that the evidence was insufficient to support the second jury's verdict on importation of cocaine. Finally, Munro contends that his trial should have been severed to allow him access to documents that were suppressed on behalf of co-defendant de la Fuente and that prejudicial variance between the conspiracy charged and the evidence produced at trial requires reversal of his conviction on count two. We affirm the conviction of each appellant for the reasons that follow.
 
 III. ANALYSIS
 A. Juror Misconduct (de la Fuente)
 
 13
 The district court found that the evidence against de la Fuente was so overwhelming that juror Hunter's consideration of the extrinsic information he gleaned from the newspaper could not have been prejudicial. De la Fuente argues on appeal that the extrinsic information was so inherently prejudicial that the district court erred in requiring a showing of actual prejudice and should have presumed prejudice to follow from the misconduct. He also argues that the evidence of Hunter's actual bias against de la Fuente requires that we reverse the denial of the motion for a new trial. Because we hold that de la Fuente waived his juror misconduct claim by failing to bring the evidence of misconduct to the court's attention before the jury rendered its verdict, we affirm the denial of de la Fuente's motion for new trial.
 
 
 14
 De la Fuente's attorney first learned of juror Hunter's misconduct when he received a telephone call from Andrew Harris, Jr., on Saturday, June 10, 1984. Record, Vol. 68 at 152-53, 155. Harris told the attorney that Hunter had discussed the case with Harris' aunt, Hunter's neighbor, during the time the trial was in progress and had stated that de la Fuente was guilty before all the evidence had been presented. Saturday, June 10, fell in the midst of the jury's deliberations. The jury did not return its verdict until Wednesday, June 13. Yet, the attorney did not notify the court of possible juror taint until he filed de la Fuente's motion for new trial on June 28, 1984. Such neglect is inexcusable.
 
 
 15
 Our cases teach that "a defendant cannot learn of juror misconduct during the trial, gamble on a favorable verdict by remaining silent, and then complain in a post-verdict motion that the verdict was prejudicially influenced by that misconduct." United States v. Jones, 597 F.2d 485, 488 n. 3 (5th Cir.1979).[2] In Jones, the court explained that a motion for new trial based on juror misconduct is a form of new trial motion for newly discovered evidence. Id. at 488. As such, the motion must be supported by proof that the evidence of misconduct was not discovered until after the verdict was returned. In the particular context of juror misconduct, this rule serves to ensure that the trial court is given every available opportunity to attempt to salvage the trial by ridding the jury of prejudicial influences. Thus, where the defendant or defense counsel knows of juror misconduct or bias before the verdict is returned but fails to share this knowledge with the court until after the verdict is announced, the misconduct may not be raised as a ground for a new trial. Id.; see also United States v. Edwards, 696 F.2d 1277, 1282 (11th Cir.1983), cert. denied, 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1984) (no abuse of discretion in refusing to interrogate jury about alleged juror misconduct where defendant waited to hear the verdict before contesting jury's impartiality); United States v. Dean, 667 F.2d 729, 732-34 (8th Cir.1982) (en banc) (untimely notification of juror misconduct waives right to new trial even where actual prejudice can be shown).
 
 
 16
 In this case, not only did de la Fuente fail to offer the requisite evidence of timeliness, it is clear beyond dispute that he could not have carried his burden of showing that he discovered the evidence of misconduct after the jury's verdicts were returned. His decision to gamble on the jury rather than inform the court of the problem in time to allow for corrective action is fatal to his juror misconduct claim. We therefore affirm the denial of de la Fuente's motion for new trial.
 
 
 17
 Bolinger and McTeer argue that the juror misconduct requires reversal of their convictions. As there is no evidence that Hunter or any other juror was biased against them or learned any extrinsic information relevant to their cases, we affirm their convictions. See United States v. Brantley, 733 F.2d 1429, 1440-41 (11th Cir.1984).
 
 
 18
 B. Post-trial Recantation by Government Witness (de la Fuente)
 
 
 19
 Government witness Charles Burroughs testified at trial that de la Fuente directed and controlled a network of people involved in the distribution of marijuana and cocaine. This evidence was relevant to the requirement that a CCE defendant be shown to have occupied "a position of organizer, a supervisory position, or any other position of management" with respect to those with whom he is alleged to have acted in concert. 21 U.S.C. Sec. 848(b)(2)(A). De la Fuente argues that Burroughs effectively recanted his testimony regarding this element when he testified at a post-trial jeopardy assessment proceeding that the persons to whom de la Fuente distributed drugs stood as independent contractors in relation to de la Fuente. The district court denied de la Fuente's motion for new trial based on this "newly discovered evidence." We affirm.
 
 
 20
 The denial of a motion for new trial based on newly discovered evidence will be reversed only where the district court has abused its discretion. United States v. Haimowitz, 725 F.2d 1561, 1574 (11th Cir.1984). Five elements must be presented to justify a new trial: (1) the evidence must be discovered following trial; (2) the movant must show due diligence to discover the evidence; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material to issues before the court; and (5) the evidence must be of such a nature that a new trial would probably produce a new result. Id.
 
 
 21
 In this case, the "new" evidence, to the extent it is inconsistent with Burroughs' trial testimony, is merely impeachment evidence and therefore is insufficient to justify a new trial. Moreover, it is unlikely that introduction of Burroughs' post-trial testimony would produce a new result. Burroughs' later testimony is not necessarily inconsistent with that upon which de la Fuente's conviction rests. That de la Fuente did not direct those to whom he distributed narcotics to redistribute or dispose of them in any particular way does not lead ineluctably to the conclusion that he did not organize, manage or supervise them within the meaning of the CCE statute. Thus, not only is the fifth element for a new trial lacking, it does not appear that Burroughs' post-trial testimony is really new evidence; rather, it is cumulative of the testimony given at trial. Therefore, the district court did not abuse its discretion in denying de la Fuente's motion for new trial on the basis of newly discovered evidence.
 
 
 22
 C. Severance to Allow Co-defendants to Testify (de la Fuente)
 
 
 23
 On May 14, 1984, de la Fuente moved to sever the trial of the CCE charge on the ground his co-defendants would testify that he did not organize, supervise or manage them. He offered in support of his motion the affidavits of the trial counsel of co-defendants Hall, McTeer, Koermandy, McPherron, Bolinger and Cruz-Barrientos, each of which stated that the attorney's client would be willing to testify at a separate trial and that:
 
 
 24
 In my professional opinion, my client's testimony at de la Fuente's trial on Count I would constitute relevant and probative evidence tending to exculpate de la Fuente as to the continuing criminal enterprise charged in Count I of the indictment, specifically as it relates to those elements of the CCE offense which charge de la Fuente with occupying a position of organizer, supervisor, or manager, in a continuing series of violations.
 
 
 25
 Record, Vol. 8, at 1421-22. Each attorney also stated that he or she would not set forth incriminating details but would proffer the exculpatory testimony in camera.
 
 
 26
 The district court denied the motion on the ground that it was untimely and that de la Fuente had not given adequate assurance that severance would produce the exculpatory testimony. Because the basis for the district court's determination that the motion was untimely is unclear, we will not decide whether the timeliness rationale alone would require that we affirm the district court's decision. Rather, we affirm the denial on the ground that the district court did not abuse its discretion in concluding that de la Fuente offered insufficient assurance that severance was justified.
 
 
 27
 To demonstrate that severance is authorized on the ground that co-defendants will provide exculpatory testimony, the defendant must initially prove "a bona fide need for the testimony, the substance of the desired testimony, the exculpatory effect of the desired testimony, and that the co-defendant would indeed have testified at a separate trial." United States v. Johnson, 713 F.2d 633, 640 (11th Cir.1983) (citations omitted). In Johnson, we held that a co-defendant's affidavit containing bare conclusory assertions and lacking specificity was insufficient to satisfy the defendant's initial burden. Denial of severance did not, therefore, amount to an abuse of discretion.
 
 
 28
 As in Johnson, de la Fuente's motion was supported by conclusory allegations providing no clear indication of specific and exonerative facts to which his co-defendants would testify. As de la Fuente did not reveal the substance of the desired testimony as required to satisfy his initial burden, his motion was duly denied. In addition, we note that a court must "give weight to the timeliness of the [severance] motion" in determining whether it should be granted. Johnson, 713 F.2d at 641. That de la Fuente's motion was filed on the eve of trial[3] made it likely that severance would place a heavy burden on judicial resources. The concern for judicial economy supports the district court's decision to deny severance. Id. We cannot say that the court abused its discretion and therefore affirm the denial of de la Fuente's motion to sever.
 
 
 29
 D. Conspiracy as Predicate Offense to CCE (de la Fuente)
 
 
 30
 One of the three predicate offenses underlying de la Fuente's CCE conviction is conspiracy to import cocaine. De la Fuente asks us to "abandon" the precedent in this circuit holding that a conspiracy offense may serve as one of the three predicate offenses required to support a CCE conviction. See United States v. Brantley, 733 F.2d 1429 (11th Cir.1984). This argument obviously deserves no consideration.
 
 
 31
 E. Jury Instructions on "In Concert" Requirement (de la Fuente)
 
 
 32
 De la Fuente requested the district court to instruct the jury that the government had to prove that de la Fuente conspired with five or more persons to prove that he acted "in concert" with them under 21 U.S.C. Sec. 848. The district court refused to give the requested instruction. De la Fuente argues on appeal that the district court clearly erred as a matter of law and that this error necessitates that he be granted a new trial. Although de la Fuente correctly states the law, the district court's error does not warrant reversal.
 
 
 33
 "The refusal to give a requested instruction warrants reversal only if (1) the instruction was substantially correct, (2) the requested instruction [was] not addressed in the charge actually given and (3) the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense." United States v. Lopez, 758 F.2d 1517, 1521 (11th Cir.1985). The first two elements are present in this case, but de la Fuente has failed to persuade us that his defense was seriously impaired by the district court's error.
 
 
 34
 De la Fuente's requested instruction was substantially correct. De la Fuente asked the court to instruct the jury that it must find conspiratorial agreement between de la Fuente and each of the five or more persons with whom he acted in concert. Such an instruction is in accord with our interpretation of 21 U.S.C. Sec. 848:
 
 
 35
 The [CCE] statute requires that a defendant must act "in concert" with five or more persons. The Supreme Court and this court have interpreted this to encompass the agreement required to prove a conspiracy.
 
 
 36
 United States v. Michel, 588 F.2d 986, 989 (5th Cir.1979) (citing Jeffers v. United States, 432 U.S. 137, 150, 97 S.Ct. 2207, 2215, 53 L.Ed.2d 168 (1977)).[4] Furthermore, it is clear from the record that the district court's instruction did not encompass the agreement requirement.
 
 
 37
 Nonetheless, de la Fuente has not explained how the district court's error "seriously impaired [his] ability to present an effective defense." He insists that the district court's interpretation would allow a jury to find a CCE violation where the defendant acted in concert with five or more "innocent dupes." Be that as it may, the jury certainly could not have believed from the evidence presented at trial that de la Fuente acted in concert with five or more innocent dupes. That the jury convicted de la Fuente of conspiracy to import cocaine demonstrates that they found the requisite agreement between de la Fuente and one or more co-defendants. Moreover, de la Fuente's defense was not lack of agreement. It is clear from de la Fuente's opening and closing statements that his defense to the CCE charge was that the government witnesses, not he, were the organizers/supervisors/managers guilty of engaging in a CCE. More generally, he attacked the overall character and credibility of the government witnesses. He never argued, and the evidence does not show, that the requisite agreement between him and each of those with whom he was alleged to have acted in concert was lacking. Having failed to show that his defense was impaired, de la Fuente falls short of convincing us that his conviction on count one must be reversed.
 
 
 38
 F. Sufficiency of Evidence of Conspiracy to Import Cocaine (Cruz-Barrientos)
 
 
 39
 Cruz-Barrientos argues that the evidence at his second trial was insufficient to support his conviction for conspiracy to import cocaine in violation of 21 U.S.C. Sec. 963. He contends that the testimony of the government's chief witness, Charles Burroughs, was contradicted by information contained in Cruz-Barrientos' passports and by the testimony of Joseph Crawford. He also contends that there was no evidence, and no basis for any inference, that he knew the cocaine was to be imported into the United States.
 
 
 40
 Title 21 U.S.C. Sec. 963 requires proof of "(1) the existence of an agreement (2) to import (3) a controlled substance (4) into the United States and (5) the defendants' knowing and voluntary participation in the agreement." United States v. Boldin, 779 F.2d 618, 619 (11th Cir.1986), modifying 772 F.2d 719, 727 (1985). There was clearly sufficient evidence adduced at trial to prove the first four elements and Cruz-Barrientos' knowing and voluntary participating in an agreement to transport cocaine from Bolivia to Honduras. The question whether he participated with knowledge that the cocaine was to be transported to the United States is more difficult, but we conclude that the evidence was sufficient to sustain his conviction.
 
 
 41
 The evidence showed that Cruz-Barrientos met with Charles Burroughs and others in Florida to plan the transportation of the cocaine from Bolivia to Honduras. He was informed by Burroughs that his cargo would be cocaine. Notes in Cruz-Barrientos' daily calendar correspond to the round-trip route between Honduras and Bolivia that he and Burroughs had selected. Gov't Exhibit No. 1 at February 9, 1982-February 14, 1982. His passport shows that he entered Panama on the day his daily calendar shows he was to land in that country en route to Bolivia. Gov't Exhibit No. 2 at 46. Joseph Crawford testified that he met with Cruz-Barrientos in Honduras prior to the scheduled trip to Bolivia as had been arranged.
 
 
 42
 Cruz-Barrientos points to inconsistencies in the evidence to support his argument that the evidence of his participation was insufficient to support his conviction. Cruz-Barrientos' contention that Crawford's testimony contradicted Burroughs' at key points is unsupported by the record. In fact, Burroughs never testified to many of the facts that Cruz-Barrientos claims were refuted by Crawford.
 
 
 43
 More troubling is the inconsistency between the passports and Burroughs' testimony that he and Cruz-Barrientos met continuously for four to five weeks in October and November of 1981 in Florida. Cruz-Barrientos' passports indicate that he entered and exited the United States several times and was in the United States for something less than a total of four to five weeks during the relevant period. Even accepting that the passports conclusively refute Burroughs' testimony with regard to the duration and continuous nature of Cruz-Barrientos' presence in the United States, they do not necessarily raise a reasonable doubt whether Cruz-Barrientos was in the United States during the October-November, 1981, period long enough to make the plans and practice flights Burroughs testified that he made.
 
 
 44
 Moreover, examination of the passports reveals that they are unreliable to establish Cruz-Barrientos' presence in any particular country at any given time. In the first place, Cruz-Barrientos was using two passports at the same time at the end of 1981 and beginning of 1982. Further, they do not reveal every entry and exit he made. For instance, one passport shows that he entered Colombia on October 4, 1981. Gov't Exhibit No. 2 at 44. The other shows that he left Honduras on October 5, 1981, to go to the United States. Gov't Exhibit No. 1 at 7. There is no corresponding stamp recording his exit from Colombia to go to Honduras.[5] There is also no stamp showing entry into the United States until October 9, 1981. Gov't Exhibit No. 2 at 41. That trip was preceded by an unrecorded re-entry into Colombia, which is evidenced by his recorded exit therefrom on October 9, 1981. Gov't Exhibit No. 2 at 36. The passports reveal other instances where Cruz-Barrientos must have crossed borders without going through customs that need not be listed here. The point is that little can be deduced from the passports by way of refutation of Burroughs' testimony beyond the fact that Cruz-Barrientos did not stay put in Florida during the four to five week period as Burroughs implied he did. This inconsistency does not threaten the sufficiency of the evidence.
 
 
 45
 The weakest part of the government's case was the evidence that Cruz-Barrientos knew that the cocaine was to be transported from Honduras into the United States. To sustain his conviction for conspiracy to import a controlled substance, the evidence must be sufficient to show that Cruz-Barrientos knew the cocaine was to be imported. United States v. Bascaro, 742 F.2d 1335, 1360 (11th Cir.1984), cert. denied sub nom. Hobson v. United States, --- U.S. ----, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1985), Villenueva v. United States, --- U.S. ----, 105 S.Ct. 3477, 87 L.Ed.2d 613 (1985), Waldrop v. United States, --- U.S. ----, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985). This knowledge may be inferred from circumstantial evidence. See id.
 
 
 46
 In this case, there was no direct evidence that Cruz-Barrientos knew the cocaine he flew from Bolivia to Honduras was ultimately bound for the United States. There was no testimony that any co-conspirator ever revealed the ultimate objective of the agreement in Cruz-Barrientos' presence. While it is clear that several of the people with whom Cruz-Barrientos came into contact were aware of the destination of the cocaine, "a defendant will not be held to have knowledge of any illegal importation solely on the basis of evidence that one or more of his alleged co-conspirators had such knowledge." Id.
 
 
 47
 Nonetheless, while this case presents a close question, we believe that the jury was warranted in finding that Cruz-Barrientos had the requisite knowledge. All the planning of the importation scheme, including Cruz-Barrientos' participation in it, took place in the United States. Burroughs testified that he had discussions with Cruz-Barrientos "concerning specific, the specifics of [the] plan to bring this cocaine back." Record, Vol. 72 at 58. Cruz-Barrientos knew that the plane he was to fly between Honduras and Bolivia had to be ferried to Honduras from the United States in the first place. All the people with whom Cruz-Barrientos had extensive dealings (Burroughs, Crawford, Rick McPherron and Ernie Ratte) knew that the cocaine was to be imported into the United States. All of the participants except Cruz-Barrientos lived in the United States and were to return there after the plane reached Honduras. The jury could infer that Cruz-Barrientos knew that the ultimate objective of the scheme in which he participated was to transport the cocaine to the United States for distribution. As the evidence was sufficient to support the jury's finding that Cruz-Barrientos conspired to import cocaine into the United States, we affirm his conviction.
 
 G. Collateral Estoppel (Hall)
 
 48
 Johnny Dean Hall argues that the government should have been collaterally estopped from introducing the evidence on which he was convicted at his second trial for importation of cocaine by his acquittal of conspiracy to import cocaine at the first trial. Essentially, he contends that the evidence presented at the second trial, if believed, would prove conspiracy to import. Since the first jury acquitted him of the conspiracy charge after consideration of the same evidence, it must have rejected the facts the government sought to prove at the second trial. The government should therefore have been barred from introducing the evidence it presented at the second trial.
 
 
 49
 The doctrine of collateral estoppel prohibits the government from relitigating facts necessarily established against it in a previous trial. Ashe v. Swenson, 397 U.S. 436, 446, 90 S.Ct. 1189, 1196, 25 L.Ed.2d 469 (1970); United States v. Griggs, 651 F.2d 396, 399 (5th Cir. Unit B 1981). The collateral estoppel doctrine is related to the prohibition against subjecting a criminal defendant to double jeopardy for the same crime but may operate in a more limited fashion to bar only relitigation of certain facts rather than to bar subsequent prosecution altogether. On the other hand, where a jury necessarily determines an ultimate fact in the defendant's favor, the government may, as a practical matter, be barred from prosecuting the same defendant for a different crime if its prosecuting the same defendant for a different crime if its prosecution depends on the evidence rejected by the jury in the first trial.
 
 
 50
 Thus, if it can be determined that the first jury must have determined an ultimate fact common to the conspiracy and substantive crimes in the defendant's favor, acquittal of conspiracy may prevent the government from introducing the evidence necessary to convict the defendant of the substantive offense in a subsequent trial. Thus, although aiding and abetting the commission of a crime and conspiracy to commit that crime are separate and distinct offenses because conviction for conspiracy requires proof of agreement while conviction for the underlying substantive offense does not, United States v. Nelson, 599 F.2d 714, 716 (5th Cir.1979), the fact that the double jeopardy clause permits prosecution for both conspiracy and aiding and abetting, id., does not mean that it may not be barred under collateral estoppel principles from introducing the same evidence to prove importation that was rejected by the jury at the conspiracy trial. "[I]n a second trial the doctrine of collateral estoppel will prohibit the Government from using evidence which, if believed, would necessarily indicate participation in the conspiracy which the Government failed to prove in the first trial." Id. at 716-17.
 
 
 51
 We agree with the government and the district court that the only possible interpretation of the first jury's acquittal with respect to conspiracy and failure to reach a verdict with respect to the substantive importation count is that the jury found there was insufficient evidence of agreement to support a conspiracy conviction. Had the jury disbelieved the evidence of Hall's actual participation in the acts in furtherance of the conspiracy's objective, it would have acquitted him of the substantive charge. Thus, it was not error for the district court to admit evidence of Hall's acts of participation and admissions with respect thereto at the second trial. The district court properly excluded the evidence of co-conspirators' statements and acts of planning.
 
 
 52
 We recognize that substantial evidence produced at the first trial was also admitted at the second. At both trials, the government introduced Hitchens' testimony that Hall told him he intended to kick the cocaine off the seaplane, Hall's passport showing his departure from Honduras on the day the drop was made, the testimony of Burroughs that McPherron was at the controls of the plane when the bundles were dropped out of the plane and the customs agents' testimony that they followed the plane to the Gainesville airport where they saw only Hall and McPherron get off the plane. Contrary to Hall's assertions, however, this evidence was not necessarily rejected by the first jury. While it is all relevant to the conspiracy of which Hall was acquitted, it does not go to the particular element--agreement--that the jury must have found lacking. Rather, the evidence is relevant to Hall's participation in the actual importation. As this element was not decided in his favor at the first trial, Hall's conviction is not due to be overturned on collateral estoppel grounds.
 
 
 53
 Hall also makes what amounts to a challenge to the sufficiency of the evidence at the second trial.[6] This argument is clearly without merit. The government's evidence placed Hall on an airplane with McPherron, who was piloting the plane. This airplane was followed from outside the United States into the United States. Although government agents lost sight of the plane for approximately twenty to thirty minutes, Burroughs testified that a parcel of cocaine was kicked from the airplane to him and that, although he could not see the person who unloaded the cocaine, he could see that the person piloting the plane was not Hall. Government agents regained sight of the plane and were waiting for it when it landed. Only Hall and McPherron were aboard. This evidence, if believed, establishes beyond a reasonable doubt that Hall unloaded the cocaine from the airplane. There was also testimony at trial that Hall had stated before the flight that he would be going along to unload the cocaine. Hall's argument that he was merely present and had no knowledge that the plane was carrying cocaine is not persuasive.
 
 H. Severance and Variance (Munro)
 
 54
 Bruce Munro argues that the district court erred in denying his motion to sever his trial from that of de la Fuente. Because he was tried with de la Fuente, Munro was not allowed to use certain documents that had been suppressed as the result of an illegal seizure from de la Fuente to cross-examine Charles Burroughs and Larry Fitzpatrick. The documents pertained to certain real estate transactions purported by Fitzpatrick and Burroughs to have been for laundering the proceeds of the drug transactions.
 
 
 55
 We hold that the district court did not abuse its discretion in denying severance. Munro's counsel's cross-examination of Burroughs and Fitzpatrick on the subject of the real estate deals was lengthy and extensive. He managed to use two of the suppressed documents to obtain answers supportive of his defense before anyone noticed he was referring to inadmissible documents. The area of cross-examination foreclosed by suppression was, as the district court noted, "miniscule." Munro could not have been prejudiced by the denial of his severance motion as there was sufficient evidence connecting him directly to the distribution schemes. Evidence of his laundering activities was not necessary for his conviction.
 
 
 56
 Munro next argues that he was prejudiced by variance between the single conspiracy alleged in the indictment and the evidence of at least two conspiracies, the second being to launder money, introduced at trial. He contends he was prejudiced by "massive spillover" from evidence against his co-defendants.
 
 
 57
 This argument fails at the outset because the record clearly supports a finding of one conspiracy beyond a reasonable doubt. In reviewing the evidence to determine whether the finding of a single conspiracy was warranted, we examine three factors: (1) whether a common goal existed, (2) the nature of the criminal scheme, and (3) the overlapping of the participants in the various dealings of the conspiracy. United States v. Brito, 721 F.2d 743, 747 (11th Cir.1983).
 
 
 58
 In this case, the common objective of the conspiracy was to distribute cocaine and marijuana for the financial benefit of the participants. Even had certain persons, such as Munro, been involved only in the laundering facet, they could have been found to be part of the conspiracy to distribute controlled substances. See United States v. Orozco-Prada, 732 F.2d 1076, 1079-81 (2d Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 154, 83 L.Ed.2d 92 (1984). The fact that Munro and others participated both in laundering and in distribution merely supports the conclusion that there was a single conspiracy. Finally, as Burroughs testified, it is in the nature of large scale drug dealings that means will be needed to conceal the source of considerable illegal proceeds. Laundering is thus integral to the type of distribution conspiracy involved in this case. We hold that there was no variance between the conspiracy pled and the conspiracy proved. It was not unfair to try Munro with the other participants in the conspiracy.
 
 IV. CONCLUSION
 
 59
 For the foregoing reasons, we affirm the convictions of de la Fuente, Bolinger, McTeer, Cruz-Barrientos, Hall and Munro.
 
 
 60
 AFFIRMED.
 
 
 
 *
 Honorable Thomas E. Fairchild, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 The original indictment was in eight counts and named twelve defendants. Two of the counts involved extortion charges against de la Fuente and were severed for a separate trial. Two of the original defendants, Larry Fitzpatrick and Robert Starr, pled guilty and testified for the government. A third defendant was a fugitive during trial, while a fourth successfully moved for a separate trial. Thus appellants' trial involved six counts and eight defendants. The numbering of the counts in this opinion corresponds to that in the redacted indictment
 
 
 [2]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981
 
 
 [3]
 De la Fuente's motion was filed and denied on May 14, 1984. The jury was sworn on May 16, 1984
 
 
 [4]
 It is because the "in concert" requirement is interpreted this way that conspiracy violations under Title 21 are considered lesser included offenses of the CCE statute. Jeffers, 432 U.S. at 150-51, 97 S.Ct. at 2215-16; see Brantley, 733 F.2d at 1429
 
 
 [5]
 The passports reveal that Colombia records both entries and exits across its borders
 
 
 [6]
 Hall raises his sufficiency arguments in the context of arguing that the district court erred in denying his post-trial motion for Judgment of Acquittal on the substantive count following the first trial. His motion was based on the argument that a verdict of guilty on the substantive count would be inconsistent with acquittal on the conspiracy count. We have already explained that these verdicts are not necessarily inconsistent. We will nonetheless address the sufficiency argument